# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

IN RE ) 
    )     **Case No. 07-00020-TLM**

SMITTY INVESTMENT GROUP, )
LLC, )     **Chapter 11**
    )
    Debtor. )
_____)

## MEMORANDUM OF DECISION
_____

### INTRODUCTION

This chapter 11 case was commenced on January 4, 2007. The issue before the Court is confirmation of the Plan of Reorganization ("Plan"), Doc. No. 113, filed on September 27, 2007 by the chapter 11 debtor in possession, Smitty Investment Group, LLC ("SIG"). An unsecured creditor, The Bradshaw Trust ("Bradshaw"), filed an objection to confirmation of the Plan. *See* Doc. No. 144.[1] Bradshaw appeared at the confirmation hearing, held on January 23 and 25, 2008, to advance that objection.[2] The matter was taken under advisement on February

_____

[1] The managing member of SIG, Randall Lee Smith ("Smith") filed a voluntary chapter 7 petition for relief on July 26, 2007, Case No. 07-01160-TLM. Bradshaw filed an adversary proceeding against Smith, Adv. No. 07-06051-TLM, asserting nondischargeability of a certain debt under § 523(a)(2)(A). That adversary proceeding is scheduled for trial in September, 2008. Smith was granted a general discharge on November 7, 2007.

[2] There was also an objection filed by Tamarack Resort, LLC, Doc. No. 150, but that objection was resolved, and Tamarack Resort did not appear at hearing. Additionally, the United
(continued...)

MEMORANDUM OF DECISION - 1

22, 2008, after the last of the post-hearing briefs was filed.  Doc. Nos. 159, 162.

The Court has considered carefully the evidence presented at hearing, the arguments and the briefing of the parties, and applicable authorities.  The Court concludes that Bradshaw's objection to confirmation under § 1129(a)(11)[3] will be sustained and confirmation of the Plan will be denied.  This Decision constitutes the Court's findings and conclusions.  Fed. R. Bankr. P. 7052, 9014.

## BACKGROUND AND FACTS

SIG, an Idaho limited liability company, was formed in 2002.  Smith was and is its managing member.  Other members included Reginald Gardner and various members of Smith's family.  SIG's business included buying and selling real property and, later, acquisition of "Re/Max" real estate brokerage franchises in several Idaho communities.  While SIG owned those franchises, day-to-day operations of the franchises were handled by other business entities, though members of SIG were the principals of those other operating entities.  SIG loaned funds to and otherwise subsidized the various Re/Max franchises, including investments in leasehold improvements.  Many of these franchises failed or were terminated.  SIG and Smith were exposed to claims, lawsuits and judgments due to

---

[2](...continued)
States Trustee appeared on the first day of hearing but, having raised no objection to confirmation, did not argue and declined to appear on the second day of hearing.

[3]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

MEMORANDUM OF DECISION - 2

those failed operations.

The other significant aspect of SIG's business was the purchase and development of real property.  Among the real property assets acquired by SIG and still held at the time of filing are the "Amity Property," an approximately 10 acre parcel on Amity Road in Meridian, Ada County, Idaho, and the "Midland Property," an approximately 1 acre parcel located near a new Interstate off-ramp in Nampa, Canyon County, Idaho.

SIG's Plan proposes to sell both these properties, with the Amity Property (a prospective single-family or multi-family residential subdivision) to be sold no later than the 4th anniversary of the Plan's effective date, and the Midland property (prospective commercial/office space) to be sold by the 5th anniversary.[4] SIG's Plan thus contemplates a significant and intentional delay as it "proposes to hold the real property for sale until the real estate market rebounds" because SIG and its witnesses believe these properties "should not be sold in today's depressed buyer's market."  Doc. No. 159 at 3 (SIG Post-Confirmation Memorandum). Bradshaw's objections to confirmation are based on the basic "hold-and-sell-later" nature of SIG's proposal, some tangential features of the Plan, and concerns over

---

[4] There is a third parcel, the "Lakemoor Property," which is a residence in the Island Woods subdivision in Ada County, Idaho.  SIG's Plan contemplated selling that property before the secured creditor, who has already obtained stay relief, completed foreclosure.  At the confirmation hearing in January, 2008, SIG advised that the foreclosure sale was set for a date in March, 2008.  There are no pleadings or documents filed with this Court after the confirmation hearing indicating any sale by SIG, nor anything indicating that the foreclosure was completed or the results thereof.

MEMORANDUM OF DECISION - 3

how Smith has conducted business operations through his several business entities.  Those objections are asserted primarily under § 1129(a)(3) (good faith) and § 1129(a)(11) (feasibility).

### A.    Acceptances and rejections of the Plan

SIG filed a summary of balloting on the Plan and of objections to confirmation, consistent with Local Rule.[5]  Doc. No. 154.  Classes 4, 6, and 11B accepted the Plan.  However, classes 5, 8, 9 and 11A rejected the Plan.  *Id.*[6]  SIG seeks to confirm the Plan over the rejections under § 1129(b).

### B.    The confirmation hearing

In support of confirmation of the Plan, SIG called three witnesses at hearing.

Michael Hon, a real estate broker and owner of Iron Eagle Realty, testified that he has been a Realtor since 2004 and has dealt in investment properties since 2002.  He handled a total of $6.5 million in transactions in 2007, with $5.5 million of that in residential properties.  He testified that the Ada and Canyon County (also called "Treasure Valley") residential real estate market was seriously

---

[5] *See* LBR 3018.1; LBR 3020.1.

[6] Class 5 consists of the secured creditor on the Lakemoor Property and a homeowner's association.  Class 8 is a secured creditor on the Amity Property (Krider) and Class 9 is a secured creditor on the Midland Property (Guymon).  The creditors in those classes did not file objections to confirmation or appear at hearing.  Bradshaw is an unsecured creditor in Class 11A and, while members of that class voted in sufficient number to accept the Plan, Bradshaw's rejecting ballot resulted in SIG not obtaining the acceptances of 2/3 of the amount of claims voting.  *See* § 1126(c).

MEMORANDUM OF DECISION - 4

overbuilt and, for that reason and due to the recent difficulties in the mortgage and

housing industries, became significantly depressed and turned into a "buyer's

market" in 2007. He estimates there presently exists 9 to 10 months of inventory

of single-family residences in the Treasure Valley, while perhaps 6 months of such

inventory would be "equilibrium" in this market. All of this has resulted in a

serious downward pressure on housing prices and created a very difficult

environment for home builders and for developers bringing new housing

developments on line. Hon also opined that the current situation presented an

opportunity for investors to acquire properties or developments at a bargain price,

assuming they can afford to hold the same and delay further development or sale

until market conditions changed. He believed that 2008 would remain as

challenging as 2007, and that 2009 would be "flat" though trending back toward

equilibrium.

Penny Leavitt was licensed as a real estate agent in 1979 and as a broker in

1983.[7] She generally shares Hon's views on the market. Leavitt supports SIG's

proposal to hold the Amity and Midland Properties for a minimum of two years in

order to (a) continue planning and/or development efforts such as engineering and

platting and (b) await a rebound or turnaround in the Treasure Valley residential

---

[7] Leavitt is also an unsecured creditor of SIG. She cast an accepting ballot in Class 11A. Liens under deed of trust held by Leavitt were avoided as a preference in an adversary proceeding prosecuted by SIG, as were judgment liens held by Bradshaw. *See* Adv. No. 07-06045-TLM at Doc. No. 1; Doc. Nos. 13, 15 (stipulation and order re: Bradshaw release of liens); Doc. Nos. 37, 40 (default and default judgment re: Leavitt liens).

MEMORANDUM OF DECISION - 5

housing market.  She generally believes that the local real estate market will rise.

Her opinion, in effect, is that if that market goes down, it will always go back up.

Leavitt also testified that she planned to move to Riverside Realty, Inc. – an

entity formed by Smith in March, 2007 – as a broker and to take several real estate

agents with her.[8]  SIG contemplates that Riverside Realty, Inc. will assist in the

listing and sale of the Amity and Midland Properties, though by an oral

amendment of the Plan at the confirmation hearing, SIG indicates that Riverside

Realty, Inc. will not be paid any commissions (listing or selling) for doing so.

SIG's third, and primary, witness was Smith.  Smith acknowledged he is

the managing member of SIG, and is responsible for its conduct as debtor in

possession, including its filing of monthly financial reports.  He is also responsible

for the information contained in SIG's disclosure statement, Doc. No. 112,

including its appendices, and much of his testimony was based on or addressed

those materials.

Smith has 4 years of post-high school education, but lacks any degree.  He

---

[8]  Smith is the sole owner of Riverside Realty PM, Inc., formed on January 23, 2007, shortly after SIG's petition for relief.  ("PM" in the name stands for "property management.") This entity leases certain business offices in Boise, Idaho, and SIG subleases the same.  Smith is also the sole owner of Riverside Realty, Inc., a real estate agency formed in March, 2007.  The 100% ownership of both entities was disclosed in Smith's chapter 7 bankruptcy schedules.  The trustee in that case had neither abandoned nor administered the ownership interests (which were property of the chapter 7 estate under § 541) as of the date of SIG's chapter 11 confirmation hearing.  Following that hearing, the trustee in March, 2008, filed a report of no distribution.  *See* Case No. 07-01160-TLM at Doc. No. 41.  The chapter 7 case was closed on April 29, 2008.  *Id.* at Doc. No. 42.  The ownership interests in the companies were therefore abandoned.  *See* § 554(c).

MEMORANDUM OF DECISION - 6

started in real estate in 1992, obtaining a license as an agent.  He is not a licensed real estate broker.  He sold single family homes for 5 years and then, in 1997, started working with investors seeking to develop or "turn" properties.

Smith discussed SIG's creation, primarily as a long-term holding company, and its move in 2004 from that business model to brokering.  He also testified regarding SIG's acquiring of Re/Max franchises, something that ultimately created, Smith says, a significant financial drain on SIG.

Smith emphasized that divesting itself of the franchises and returning SIG's focus to investment and development of real estate is key to SIG's Plan.  The two parcels SIG wishes to hold, develop and sell are the Amity and Midland Properties.  The 10 acre Amity Property is bare ground with the exception of a dwelling and a manufactured home, each of which are rented out for about $1,000 per month, providing what little income SIG has received during this case.[9]

SIG wants to develop the Amity Property as a residential subdivision. Though some "preliminary talks" have been had with local government entities,

_____

[9]  This $2,000.00 per month was supplemented for a time by $1,700.00 per month in rent from the Lakemoor Property.  The resulting $3,700.00 was not sufficient to cover the roughly $3,900.00 in SIG monthly expenses (a figure exclusive of Smith's budgeted $3,000.00 in personal draws, and also exclusive of any debt service).  Smith testified that, even without personal draws or debt service, SIG was unable to meet its budget for over half a year.  However, in other testimony, he indicated that SIG could cover its monthly expenses, exclusive of personal draws, because Riverside Realty, Inc. was covering or subsidizing SIG's overhead.  *See also* Doc. No. 112 at appendix D, p. 19 (showing budget, exclusive of debt service, and noting "expenses being subsidized by tenants").  The financial relationship between SIG and Riverside Realty, Inc. was marked by lack of detail and by fluid proposals for overhead sharing, such as in Smith's testimony that Riverside Realty, Inc. would "partner" with SIG and pay one-half (or more) of SIG's rent and/or pay all SIG's overhead.  Smith also "orally amended" the Plan in regard to whether or when real estate commissions would be charged by Riverside Realty, Inc.

MEMORANDUM OF DECISION - 7

no governmental approvals for subdivision development have been obtained and

the Amity Property is not subdivided.[10]  SIG recognizes that there would need to

be a financial investment involving engineers and others in order to seek and

obtain preliminary subdivision development approval on the property.  Smith

admits that SIG has no funds to do so.[11]  Nevertheless, Smith was optimistic that

funds would be found not just in amounts sufficient to cover operating costs but in

amounts sufficient to enable SIG to commence work on developing the properties.

Such optimism was, however, nonspecific and not pinned to any actual investor or

source of funds.[12]

---

[10]  SIG does not limit its vision for the Amity Property to a stand-alone 10 acre development.  In its disclosure statement, it opines that "the economies of scale benefits" that would result from incorporating the Amity Property into a larger, perhaps 80 acre "master planned community" would be "a far more practical and economical approach."  Noting that there are eight other property owners holding adjacent parcels, SIG's "proposed strategy is to either purchase the surrounding properties with investment money from an outside partner . . . or form a development joint-venture (LLC), and include all these various property owners as partners in the project."  Doc. No. 112 at appendix D, p. 7.

[11]  Smith acknowledged in testimony that SIG has had insufficient income to meet its modest monthly cash flow requirements during the case.  *See also supra* note 9.  Smith indicated (and the disclosure statement mentioned) sale of personal property assets including a boat and trailer, could generate a small amount of income to be used in the reorganization effort.  However, in the year since filing, SIG has not sought approval to sell those assets.

[12]  This optimism was consistent with SIG's disclosure statement, which opined that "Even with the current financial situation of the company, and the respective chapter 11 reorganization, SIG does not believe that raising the necessary capital to fund the [development of the Amity and Midland Properties] will be that challenging.  Whether by primary lenders, secondary lenders, or investment partner relationships . . . avenues to subsidize the longer term goals of the reorganization successfully will be available as needed."  *See* Doc. No. 112 at appendix. D, p. 18.  *See also id.* at 20 (stating that "long-term" development funding estimated at $3,300,000.00 "will most likely come from secondary lending sources available throughout the real estate industry . . . or from investor partnerships that will be created in the interest of the reorganization process.  Both of these capital sources are viable future options available to meet the capital needs of the company.  Although SIG cannot guarantee at this time the availability of

(continued...)

MEMORANDUM OF DECISION - 8

The Amity Property stands as security for obligations to creditors Countrywide Mortgage ($241,971.58) and Krider ($439,186.54).[13] There are also unpaid real property taxes. Smith asserted at hearing that there is equity in the property given a present market value of about $800,000.00.[14] Even higher estimates of "current market" values can be found in certain of SIG's filings and exhibits.[15]

SIG's approach to the Plan not only assumes that the value of its real estate will rise, but that it will rise at a significant rate. For example, SIG's Exhibit 8 projects an increase in value of the "unimproved/undeveloped" Amity Property from $800,000.00 at confirmation to $1,300,000.00 in 2009-2010, a $500,000.00 increase. Even assuming that this appreciation will take two years to realize ($250,000.00 per year), the rate of increase in the first year is over 30%. Other

---

[12](...continued)
these funds, management is extremely optimistic that funding commitments will be in-place long before they are needed midway thru 2008.")

[13] These figures come from Countrywide's proof of claim and Krider's rejecting ballot. SIG's disclosure statement is consistent with the amount owed Countrywide. However, it lists its secured obligation to Krider at $300,000.00 on the Amity Property. *See* Doc. No. 112 at 15. The approximately $140,000.00 difference was not addressed at hearing. SIG admits both obligations are in default, and SIG does not address § 506(b) post-petition accruals.

[14] This estimate was not supported by appraisal or other corroborating testimony. But no contrary value was asserted or proven by the objector, Bradshaw.

[15] *See*, *e.g.*, SIG's disclosure statement, Doc. No. 112 at 15 (using a $1,171,600.00 figure). *But see id.* at appendix D, p.3 (using a $800,000.00 value in 2007 and a $1,500,000.00 value as of August, 2008 after "Phase 1" investments). In addition to variable "current" values, SIG has varying estimates of increased value in the immediate future. *See*, *e.g.*, Ex. 8 (asserting $800,000.00 "today" and $1,300,000.00 in "2009-2010" as unimproved and undeveloped property, with no "entitlements" and the increase coming from "just appreciation!").

MEMORANDUM OF DECISION - 9

than Smith's testimony, no evidence was offered to support these figures or

projections.  And, notwithstanding Smith's belief in substantial appreciation

between 2008 and 2010, neither Hon nor Leavitt predicted a rosier Treasure

Valley market until 2010 or later.[16]  Neither of these witnesses validated Smith's

specific projections on timing or values.  In essence, Smith's testimony is what

SIG relies on for the nature or magnitude of near term, future changes in the local

real estate market.[17]

SIG's proposals also assume even more dramatic increases in its properties'

values from future investment in design, engineering and preliminary plat

approval.[18]  Smith admitted that he had never personally developed subdivision

---

[16] Hon's testimony pegged 2008 as a continuation of 2007 and 2009 as "flat" with a retreat from the "buyer's market" starting in 2010 or later.  Leavitt essentially sees a "recovery" of the market as "inevitable" but did not express much detail as to timing, other than supporting SIG's proposal to delay sale for at least a couple of years.

[17] Much of Smith's testimony on the prospective "recovery" of the market was based on a "12-year real estate phenomenon" of expanding and declining real estate values laid out in the disclosure statement.  *See* Doc. No. 112 at appendix D, p. 4-5.  His belief is that the Boise market is within a year of exiting a 3-year "quadrant" of declining prices and poised to enter a 3-year quadrant of "absorption" of existing housing inventory.  According to Smith, the market will then transition to a 3-year quadrant of expanding or rising prices.  *Id.*  At face value, this analysis suggests the sort of market recovery critical to Smith's testimony and SIG's plans would occur in 2010 or 2011 or later, and does not support the type of dramatic 2008 and 2009 increases contained in Ex. 8.  More fundamentally, however, there are questions as to whether Smith's opinions should be accepted given he provided no source or support for this twelve year theory.  *See also* discussion of Fed. R. Evid. 702 *infra*.

[18] *See*, *e.g.*, Ex. 8 at its third example, with the Amity Property valued in 2010 at $2,000,000.00 (a $700,000.00 increase over the 2010 "just appreciation!" figure of $1,300,000.00) based on design and engineering investments.  The actual amount of investment needed to result in this increase is unspecified.  However, SIG's disclosure statement does contain a projection of the cost of "Project #1 [*i.e.*, Amity Property] - Phase 1 completion" at $150,000.00.  Doc. No. 112 at appendix D, p. 20; *see also id.* at p. 7-8 (describing "Project #1" and the "phases" of development).

MEMORANDUM OF DECISION - 10

property and conceded further that, in order to realize these gains, SIG would need

to retain engineers and others to undertake the professional work.[19]  He further

admitted that SIG had no funding in place nor any commitments for funding

needed to perform any of these development activities.

Finally, there has been no debt service to secured creditors since filing, and

SIG proposes none before the sale of the Properties.  Thus, interest, costs and fees

will accrue on the secured debt.  The amount of such accruals were not clearly

shown.[20]

## DISCUSSION AND DISPOSITION

### A.    Confirmation

The bankruptcy court shall confirm a chapter 11 plan if its proponent

proves by a preponderance of the evidence either (1) the plan meets all of the

_____

[19]  *See* Doc. No. 112 at appendix D, p. 9 (noting that SIG is presently in a "pre-application" posture, gathering necessary information, and that in order to proceed with actual development, it would need to hire, with court approval, an architect and an engineer to design and layout the actual project).  *See also* Ex. 9 (an unexecuted "professional services agreement" with a "project consultant" for the Amity Property's development).

[20]  It is hard to discern SIG's position on the actual accruals under the existing loans.  For example, the projections on Ex. 8 (after showing a sizeable boost in property value from "just appreciation!" and from investment in development activities) indicate generally that "overhead and misc. accrued interest" would be around $100,000.00 per year, including $20,000.00 per year on Countrywide's obligation and $32,000.00 per year on Krider's.  In a footnote to this exhibit, SIG states that "minimal accrued interest was reflected from 2008 to 2010, because for the most part this interest expense will be offset by rental property and various other income the company will generate during this 2-1/2 year period."  In a similar fashion, the accrual of interest was discounted as a factor in the disclosure statement, which articulated SIG's "goal" of obtaining "additional financing to take out these two debts as soon as possible . . . or by no later than July 01st, 2008."  Doc. No. 112 at appendix D, p. 21.  SIG continued by noting that refinancing this secured debt on the Amity Property would lower interest rates from around 12% per annum to an "estimated 8%" on "a new 3 to 5 year simple interest note."  *Id.*

MEMORANDUM OF DECISION - 11

§ 1129(a) requirements or, (2) if the only requirement not satisfied is § 1129(a)(8),

the plan satisfies the "cramdown" alternative of § 1129(b).  *Liberty Nat'l Enters. v.*

*Ambanc La Mesa Ltd. P'Ship* (*In re Ambanc La Mesa Ltd. P'ship*), 115 F.3d 650,

653 (9th Cir. 1997); *United States v. Arnold & Baker Farms (In re Arnold &*

*Baker Farms)*, 177 B.R. 648, 654 (9th Cir. BAP 1994).

### 1.    Debtor's Plan and Bradshaw's objection

The Plan rests, first, on the proposition that the existing Treasure Valley

real estate market, particularly the residential market, is depressed and dismal, and

that the values that can be obtained through SIG's sale of the Amity Property[21] are

less than could have been obtained over the past several years.  The objector,

Bradshaw, does not quarrel with this summary view of the present market.  The

witnesses competently testified to the state of the present market as compared to

what preceded it.

The Plan, however, rests critically on a second assumption – that the market

will improve and that, in SIG's holding the properties until 2010 or later, the

values reasonably to be obtained will justify the delay in liquidation.  SIG posits

that this would be true without any additional investment in preparing the

properties for development.  *See*, *e.g.*, Ex. 8 (projections for "just appreciation!").

As noted above, SIG also suggests that even greater increases in value would be

---

[21]  Comparatively little time and attention was spent, in testimony or argument, on the Midland Property and the commercial real estate market.

MEMORANDUM OF DECISION - 12

realized from investment of funds in the design, engineering, platting and/or initial infrastructure of a subdivision, and still more benefits from combining the Amity Property in some fashion with adjacent properties owned by non-SIG entities.  But, at bottom, SIG's Plan relies on the proposition that creditors will not be injured, and instead will be benefitted, by not liquidating properties now but instead liquidating them at a point two or more years in the future, even if there is no debt service in the interim.

Bradshaw objects, viewing SIG's projections as lacking evidentiary support.  It further characterizes SIG's proposals as "purely speculative in light of what has occurred in the last year, have no viable basis, and in essence are just a 'dream.'"  Doc. No. 162 at 8.  Bradshaw argues that – in addition to the reliance on an improving market – many factors belie SIG's ability to perform its optimistic Plan.  These factors include SIG's lack of progress in reorganizing in well over a year since filing its petition; its lack of post-petition cash flow adequate to break even in the post-petition period; its lack of available cash, including its failure to liquidate unnecessary chattels to generate cash; the lack of specific and identifiable resources required to sustain even a delayed liquidation, much less identifiable sources for loans or investments needed for an active reorganization designed to develop real property; the lack of detail regarding the interrelationship between SIG and the other Smith-controlled entities, including lack of specificity as to obligations owed to or subsidized by SIG and these entities; and SIG's lack of

MEMORANDUM OF DECISION - 13

personnel with the development and management skills required to achieve its proposals.

## 2.    The confirmation standard of feasibility

Section 1129(a)(11) requires that the Court find "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

In general, the feasibility requirement "has been interpreted to mean that the plan proponent must show a reasonable likelihood of success." *In re Wiersma*, 03.1 I.B.C.R. 42, 51 (Bankr. D. Idaho 2003) (citing *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1364-65 (9th Cir. 1986)). *Wiersma* notes that the Court should consider factors impacting that required showing, such as the adequacy of the debtor's financial structure; the earning power of the debtor's business; economic conditions; and the ability of debtor's management. *Id*. The plan proponent bears the burden of proof under a preponderance standard and, thus, bears the onus of showing that the plan, more probably than not, meets the confirmation standards. *Id.* at 49; *see also In re Trans Max Technologies, Inc.*, 349 B.R. 80, 92 (Bankr. D. Nev. 2006). Therefore, though success need not be guaranteed, and though some future uncertainty or the mere potential for failure will not necessary negate feasibility, *Wiersma,* 03.1 I.B.C.R. at 51, there still must be sufficient, competent evidence for the Court to find the required "reasonable

MEMORANDUM OF DECISION - 14

likelihood" of success.

The Ninth Circuit in *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374 (9th Cir. 1985), stated:

> The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

761 F.2d at 1382 (quotation marks omitted). Another court explained:

> The inquiry is thus on whether [the] plan proponent has sufficiently established its postconfirmation viability, and its ability to meet its future obligations. Particularly important in this regard is that the plan proponent demonstrate that any necessary financing or funding has been obtained, or is likely to be obtained. With or without this financing, however, "section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan."
>
> In assessing the evidence adduced for the feasibility requirement, "[t]he Code does not require the debtor to prove that success is inevitable, . . . and a relatively low threshold of proof will satisfy § 1129(a)(11)." But the court must still have a reasonable and credible basis for making the findings necessary under Section 1129(a)(11). In short, "[t]he debtor must offer more than speculation about the source of funding for the plan."

*Trans Max Technologies*, 349 B.R. at 92 (citations omitted).

SIG is not the first debtor to face objections based on feasibility of a plan dependent on a future sale of real property. For example, in *In re Investors Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760 (Bankr. N.D. Fla. 1994), the court recognized that:

> Plans which extensively rely on sale or refinance of real property

MEMORANDUM OF DECISION - 15

> that constitutes a debtor's primary or sole significant asset, and
> where that asset has been a marginal performer to date, are
> inherently speculative and invite close judicial scrutiny of the
> assumptions underlying the plan.

*Id.* at 765. That court found that: "Notwithstanding the Debtor's assertions that the

projection [of income necessary to implement the plan] is based on conservative

assumptions and the actual performance of the property can reasonably be

expected [to] exceed these figures, the Debtor has offered no credible evidence

that the plan is feasible on an operational basis." *Id.*  It elaborated:

> [T]he Debtor has not identified any potential buyer with the cash
> resources willing to enter such a transaction, but rather, offers its
> belief that the market for the property will strengthen over the next
> three years based on its intent to re-paint and re-name the project to
> lessen the impact of [certain prior] adverse publicity . . . and the
> effects of a stable supply of this type of [apartment complex]
> property due to local growth restrictions.  *While a proponent need
> not demonstrate the success of the plan with absolute certainty, more
> than simple optimism about future market conditions is needed to
> support the confirmation of a plan whose success depends on a
> future sale or refinance of the debtor's principal asset.*

*Id.* at 766 (emphasis added).

In re Made in Detroit, Inc. presented a similar issue.  There the debtor

acquired a 410 acre parcel for development and filed for relief after five years of

attempted development, with the property becoming its only significant asset.  299

B.R. 170, 172 (Bankr. E.D. Mich. 2003).  The plan was predicated on a nine

million dollar loan, which was contingent on, among other things, payment of a

$270,000.00 commitment fee and on receipt of a $15,000,000.00 valuation of the

MEMORANDUM OF DECISION - 16

property.  *Id.*  The court noted that, to meet the test of feasibility, the plan "cannot

be based on 'visionary promises;' it must be doable."  *Id.* at 176.

> Sincerity, honesty and willingness are not sufficient to make the plan
> feasible, and neither are visionary promises.  The test is whether the
> things which are to be done after confirmation can be done as a
> practical matter under the facts.

*Id.* (quoting *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D. 1985)).  *See also In

re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Texas 1989) ("A plan

may not be confirmed if it is not feasible, regardless of the sincere and honest

intentions of the proponent.  *In re Clarkson*, 767 F.2d [417, 420 (8th Cir.

1985)].").  The court found that, despite the debtor's sincerity, it failed to establish

that there was a reasonable assurance of success, including a reasonable likelihood

that the commitment fee and appraisal contingencies could be satisfied.  *Made in

Detroit*, 299 B.R. at 176-80.

In *Lakeside Global II*, the court noted that a balloon payment exceeding

$9,000,000.00 was "to be generated . . . primarily from the proceeds of a sale or

refinancing of the two income producing assets, the proceeds of which hopefully

are to come from some source, as yet unknown."  116 B.R. at 507.[22]  The court

concluded that the plan was not feasible as "it is not likely that the lienholders will

be paid the present value of their interest in the property, considering general

---

[22]  In *Lakeside Global II*, the court considered a proposed plan that would, during its
roughly four year term, make payments to administrative, priority and unsecured creditors, but
only partial payments to secured creditors, relying on a future sale or refinancing in order to make
a large balloon payment at the termination of the plan to fully pay the lienholders.  116 B.R. at
502-05.

MEMORANDUM OF DECISION - 17

economic conditions surrounding this debtor." *Id.*

> The owners seek to put the lienholders on hold over their objections for over three more years in the hope that the market will improve, allowing the lower ranked residual owners to sell the investment at a profit. . . .

> The court is not reasonably convinced that the market will so dramatically improve that it is legally proper to keep the lienholders in suspense while the investors bide for time. This court has consistently critically analyzed projections by experts testifying on behalf of hopeful plan proponents who represent that the market will improve such as to provide the realty with values in excess of the liens and far above current estimates.

*Id.*

The observations in all these cases are apropos here. A debtor in possession does not need to guarantee the success of the plan, but it must provide preponderating proof of a reasonable likelihood of success. *Wiersma*, 03.1 I.B.C.R. at 51. The focus, therefore, must be on the evidence presented. If the projections underlying the plan proposal "are credible, based on the balancing of all the testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible." *Lakeside Global II*, 116 B.R. at 507 n.20. However, if those projections "are incredible or simply unrealistic" or "[w]hen the financial realities do not support the projections or where the proponents' projections are unreasonable," the court should find the plan not feasible and refuse to confirm it. *Id.* at 507-08.

Here, SIG offered the testimony and opinions of three witnesses in an

attempt to meet its burden.  However, there are problems with those opinions.

### a.  The evidentiary problem

Hon, Leavitt and Smith were allowed to testify without any objection from Bradshaw.  This testimony included their expression of opinions as to the Treasure Valley real estate market, currently and at various points in the future.  Each was allowed, by the absence of objection, to prognosticate the timing of the end of the "depressed" or "buyers' market" and the return to higher prices and favorable conditions for development of subdivisions and other properties.

The Federal Rules of Evidence authorize opinion testimony by expert witnesses:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.[23]

Here, SIG offered Hon's, Leavitt's and Smith's testimony to support the proposition that the real estate market is currently depressed but would rise, and

---

[23]  If a person is *not* testifying as an expert witness under this Rule, then such person is a lay witness, and his or her "testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perceptions of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

MEMORANDUM OF DECISION - 19

that the value of SIG's properties would be sufficiently higher to justify the delay in liquidation and the lack of debt service. That these witnesses were called by SIG to testify, rather than a member of the public randomly selected to comment on the local real estate market, illustrates SIG's belief that they have sufficient "specialized knowledge" that would assist the Court in understanding the evidence or making necessary determinations on matters at issue. They were asked to testify in the form of their opinions, and their opinions were, inescapably, proffered by SIG under Federal Rule of Evidence 702.

The designation of experts under Federal Rule of Evidence 702 is significant. As *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), states, "Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" 526 U.S. at 148 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993)).

That the Court is the "gatekeeper" in admitting or considering expert opinion testimony is beyond debate. The decisions of the Supreme Court in *Daubert* and *Kumho Tire* provide the foundation. *Daubert* established that the trial court's obligation is to "ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 580. *Kumho Tire* established that the trial judge's "gatekeeping" function is not limited to

MEMORANDUM OF DECISION - 20

"scientific" expert testimony:

> We conclude that *Daubert*'s general holding – setting forth the trial judge's general "gatekeeping" obligation – applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *See* Fed. R. Evid. 702. We also conclude that a trial court *may* consider one or more of the specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Kumho Tire*, 526 U.S. at 141-42. As noted, the specific factors identified in

*Daubert* may or may not be pertinent depending on the nature of the issue, the

expert's particular expertise, and the subject of the expert's testimony.

The Supreme Court determined that:

> We do not believe that Rule 702 creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts. Life and the legal cases that it generates are too complex to warrant so definitive a match.
>
> To say this is not to deny the importance of *Daubert*'s gatekeeping requirement. The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the relevant field. . . . [W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.

*Id.* at 151-52.

MEMORANDUM OF DECISION - 21

These principles have been embraced in bankruptcy litigation.  *See*, *e.g.*, *BL Dev. Corp. v. Masella (In re Masella)*, No. 06-2010, 2007 WL 2302312 at *3 (Bankr. D. Conn. Aug. 7, 2007); *Au v. Johnson (In re Johnson)*, No 06-00105, 2007 WL 1728721 at *4 (Bankr. D. Mont. June 13, 2007); *In re Worldcom, Inc.*, 371 B.R. 33, 41 (Bankr. S.D.N.Y. 2007); *In re Spectrum Golf, Inc.*, 350 B.R. 857, 861-62 (Bankr. D. Ariz. 2006); *In re Commercial Fin. Servs., Inc.*, 350 B.R. 520, 526 (Bankr. N.D. Okla. 2005); *Chartwell Litig. Trust v. Addus Healthcare, Inc., (In re Med Diversified, Inc.)*, 334 B.R. 89, 95 (Bankr. E.D.N.Y. 2005); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 685 (S.D.N.Y. 2003); *In re Canvas Specialty, Inc.*, 261 B.R. 12, 16-22 (Bankr. C.D. Cal. 2001); *In re Husting Land & Dev. Inc.*, 255 B.R. 772, 780-81 (Bankr. D. Utah 2000).

Often, expert testimony in bankruptcy court is based on experience and specialized knowledge, rather than "science" per se.  However, whenever a witness is qualified as an expert based on such experience or knowledge, the testimony must still meet the tests for reliability under *Daubert* and *Kumho Tire*.

For example, in *Worldcom, Inc.*, the court found that despite years of experience as an economist, a witness was not qualified to testify as an expert regarding the telecommunications industry or, if he was considered to be qualified as an expert, that his testimony was not based on sufficient facts or data nor was it the product of reliable principles and methodologies.  371 B.R. at 41-44.  The court noted that its gatekeeping function "extends to economic analysis and the

MEMORANDUM OF DECISION - 22

economic expert's conclusions must be arrived at in a . . . methodologically reliable fashion." *Id.* at 41. In addition, the court found that "[w]here the assumptions underlying an expert's opinions are unsupported and speculative, the expert's testimony may properly be excluded." *Id.*

Similarly, in *Husting Land & Dev.*, a real estate developer was asked to opine on whether a particular debt was incurred in the ordinary course of debtor's business. The court found that, though the witness was qualified to testify as an expert given substantial real estate development experience, the proponent of his testimony failed to establish that the witness' opinion was admissible because the methodology used to reach that opinion did not meet the *Kumho Tire* standards. 255 B.R. at 780. Though acknowledging that some of the nonexclusive *Daubert* factors might be inapplicable to nonscientific testimony, the court concluded

> an expert witness relying solely or primarily on experience . . . "must explain how that experience leads to the conclusion reached, and why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."

*Id.* at 781 (quoting Advisory Committee Notes, Amendments to Fed. R. Evid. 702 (effective Dec. 1, 2000)).[24] It concluded that while the witness, "as a professional and competent real estate developer, is certainly capable of making experience-

---

[24] The court also cited the American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility of Expert Evidence after *Daubert*, 157 F.R.D. 571, 579 ("[W]hether the testimony concerns economic principles, accounting standards, property valuation or other non-scientific subjects, it should be evaluated by reference to the 'knowledge and experience' of that particular field."). 255 B.R. at 781.

MEMORANDUM OF DECISION - 23

based observations about his industry," he had not been shown to be qualified to

opine on the question of what constituted ordinary course of business for purposes

of a § 364(a) analysis because his methodology and approach were not sufficiently

focused or reliable. *Id.*

And the district court in *Lippe* noted that the reliability standard requires an

opinion be based on sufficient facts or data, and be the product of reliable

principles and methods properly applied. Thus, an opinion should be excluded if

"speculative or conjectural" or if it "makes no effort to account for major

variables." 288 B.R. at 686 (citations omitted). So, too, should it be excluded if it

"is connected to existing data only by the *ipse dixit* of the expert" because the

court is entitled to consider and "conclude that there is simply too great an

analytical gap between the data and the opinion proffered." *Id.* (quoting *Gen.*

*Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).[25]

The witnesses here, Hon, Leavitt and Smith, provided opinions as to the

current housing market in the Treasure Valley. They were each shown to have

several years of experience as local real estate professionals, and the Court

concludes their expert testimony, in regard to current market conditions, is

---

[25] *Ipse dixit* literally translated is "he himself spoke" or, more figuratively phrased, "because I said so." It connotes an assertion made but not proven. As the Advisory Committee Notes to the 2000 amendments to Federal Rule of Evidence 702 state: "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ('We've been presented with only the experts' qualifications, their conclusions, and their assurances of reliability. Under *Daubert*, that's not enough.')."

MEMORANDUM OF DECISION - 24

admissible.

The three witnesses also provided opinions as to when the local real estate

market will improve.  Indeed, Smith opined as to the amount the Amity property

would appreciate in various years of the Plan.  However, little was provided to

suggest the witnesses' prior experiences as real estate professionals were a

sufficient predicate for accurate predictions of future market changes.

Harkening back to the language of the Federal Rule of Evidence 702, the

expert may testify, in an opinion or otherwise "if (1) the testimony is based on

sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the

facts of the case."  Fed. R. Evid. 702.  The Advisory Committee Notes to the 2000

amendments to Federal Rule of Evidence 702 state:

> If the witness is relying solely or primarily on experience, then the
> witness must explain how that experience leads to the conclusion
> reached, why that experience is a sufficient basis for the opinion, and
> how that experience is reliably applied to the facts.

These are requirements, not merely aspirations.  The Rules, and *Daubert, Kumho*

*Tire* and progeny, require that the expert show how experience or specialized

knowledge is "reliably applied" to data, in a methodologically sound way, and that

the conclusions are adequately and reliably supported.

The record here does not establish the reliability of Hon's or Leavitt's

predictive opinion testimony under these standards.  The same sort of evidentiary

MEMORANDUM OF DECISION - 25

problem attends Smith's testimony.[26]  His oral testimony is replete with predictions
of future events related to the real estate market generally.  Smith's qualifications
to so opine were not established.  Even if Smith were arguably qualified, the
reliability of the multiple opinions he offered – tested under the standards of
Federal Rule of Evidence 702 and the precedent – was not shown.

      While no objection was raised at hearing to the testimony of any of the
three witnesses, lack of objection does not preclude the Court from considering the
adequacy of the testimony under Federal Rule of Evidence 702 and, acting as
gatekeeper, excluding such testimony.[27]

      Based on the above, the Court finds and concludes the opinion testimony of
the three witnesses (Hon, Leavitt, and Smith) as to the future housing market in the
Treasure Valley does not meet the reliability standards established in *Daubert* or
*Kumho Tire.*  None of the three witnesses explained how their specialized
experience led them to their conclusions that the housing market would rebound by
a specific year (or, in the case of Smith, by year and amount), why their experience

---

[26]  That Smith is also SIG's managing member and the primary advocate of the Plan only
compounds the problem.  *Accord In re Made In Detroit, Inc.*, 299 B.R. 170, 180 (Bankr. E.D.
Mich. 2003) (noting, in addressing opinion testimony regarding real estate value, that little weight
would be provided to that of CEO and chairman of the board of debtor corporation who not only
was not an appraiser but who also was biased given his role and ties with debtor, and that greater
weight would be provided to an independent appraiser's valuation).

[27]  *See, e.g.*, *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) (noting the differences in
approach to the gatekeeper function in bench trials, and concluding that, if the court is the fact-
finder, it does not err by admitting the evidence subject to the ability to later exclude it or
disregard it if it turns out not to meet the standard of reliability established by Federal Rule of
Evidence 702).

MEMORANDUM OF DECISION - 26

provided a sufficient bases for their projections or how their experience was reliably applied to the facts. The expert relying on experience "must do more than aver conclusorily that his experience led to his opinion." *Lippe*, 288 B.R. at 686 (quotation marks omitted). As such, the testimony as to future market values must be excluded.[28]

### b.    Remaining evidence and feasibility

Performance of a plan is, at core, an economic proposition. The *Trans Max Technologies* court noted that feasibility "requires the plan proponent to show

---

[28] The Court recognizes that in *Commercial Financial Servs.*, the court applied the *Daubert* factors to test reliability and assess the admissibility of specialized financial, accounting or valuation testimony, and stated:

> Experts in disciplines that require the use of professional judgment are less likely candidates for exclusion because challenges may be ultimately viewed as matters in which reasonable experts may differ in exercising their judgment as to the appropriate methodology to employ or the appropriate variable to plug into a calculation. Such matters may be and should be explored and highlighted through cross-examination of the expert and presentation of contrary evidence, not at the preliminary admissibility stage. In non-scientific disciplines, assuming that the opinion addresses a factual issue of consequence to the legal regime underlying a claim or defense, where the use of professional judgment may produce a broad range of acceptable opinions, so long as the expert possesses at least one of the qualifying attributes listed in Rule 702 (specialized knowledge, skill, education, experience or training), has employed a methodology recognized in the profession or by the courts, and can identify the source of the facts and data underlying the opinion (demonstrating a connection of the opinion to the facts of the case), a probing cross-examination and presentation of opposing experts and evidence will permit the fact-finder to judge the soundness of the expert's judgment, as well as the expert's credibility and potential bias, in order to assess how much weight to accord the expert's opinion.

350 B.R. at 528-29 (citation omitted). Here, the Court cannot conclude that the witnesses' testimony passes *Daubert*'s reliability tests. However, even if the Court errs in excluding the witnesses' testimony, the problems with such testimony would justify giving it little weight. *Id., see also Spectrum Golf*, 350 B.R. at 862 (determining that, if incorrect in its decision to exclude opinion testimony because the witness was unqualified as business valuation expert, problems with such witness' testimony justified giving it little weight).

MEMORANDUM OF DECISION - 27

concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." 349 B.R. at 92 (citation omitted). Even though Smith has forgone draws and even though there has been no debt service, SIG has been unable to generate the minimal amount needed to "break even" post-petition, and SIG has shown no prospective change in ability to generate funds needed for even bare maintenance of operations. SIG's future operations are tied to Smith's other business, Riverside Realty, but in an ill-defined and uncertain way. SIG has not demonstrated that it will be able to pay operating expenses on an ongoing basis, or pay its administrative expenses.[29] With the possible exception of sale of unneeded personal property assets, something not undertaken as yet in this case, SIG has no identifiable source of funds for any purpose.

SIG's repayment of secured creditors anticipates no debt service for at least two and up to five years, when the properties will be liquidated in either a developed or still undeveloped state. If SIG wishes to develop its properties, it needs funds to do so. SIG has been unable to identify in any objective way that such funds are reasonably available. Smith's predictions of future financing from "investors" or "secondary lending sources" or "investment partnerships" or other "capital sources," are generalized and entirely ungrounded.

---

[29] Simply by way of example, on April 24, 2008, SIG's bankruptcy counsel filed an application under § 331 for allowance of interim compensation and reimbursement of expenses in the amount of $52,021.99. While some portion of this amount, if allowed, could apparently be satisfied from retainer balances, the Plan follows § 1129(a)(9) and requires that administrative expenses be paid on the effective date of the Plan. SIG has shown no ability to do so.

MEMORANDUM OF DECISION - 28

In short, the Plan hinges fully on a dramatically improving real estate market. But the testimony of SIG's expert witnesses as to the future changes in the real estate market failed to meet the foundation and reliability standards of Federal Rule of Evidence 702 and the *Daubert* and *Kumho Tire* requirements. As a result, the testimony is excluded. There is insufficient evidence remaining before the Court to support a finding of feasibility and SIG's Plan cannot be confirmed.

**CONCLUSION**

Bradshaw's objection under § 1129(a)(11) will be sustained, and confirmation of the Plan will be denied. Given the Court's conclusions on the question of feasibility, Bradshaw's other confirmation objections, and evaluation of other confirmation standards that must be satisfied even in the absence of objection, need not be discussed. The Court will enter an order consistent with this Decision.

DATED: May 16, 2008

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 29